# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

## CASE NO. 9:23-CV-80512-ROSENBERG/REINHART

JOHN F. MORRISON, M.D., an individual                )
and MORRISON CLINIC, P.A., a Florida                 )
professional association,                            )
                                                     )
      Plaintiffs,                                     )
                                                     )
v.                                                   )
                                                     )
DELRAY MEDICAL CENTER, INC., a                       )
Florida for-profit corporation, DELRAY               )
MEDICAL CENTER MEDICAL STAFF                          )
CORPORATION, a Florida non-profit                    )
corporation, NEUROLOGICAL                            )
CONSULTANTS OF SOUTH FLORIDA,                         )
LLC d/b/a BRAIN AND SPINE CENTER                      )
OF SOUTH FLORIDA, a Florida limited                  )
liability company, and LLOYD ZUCKER,                 )
M.D., an individual,                                 )
                                                     )
      Defendants.                                     )
_____)

## FIRST AMENDED COMPLAINT

Plaintiffs, JOHN F. MORRISON, M.D. ("***Dr. Morrison***"), an individual, and MORRISON

CLINIC, P.A. ("***Morrison Clinic***"), a Florida professional association (collectively, "***Plaintiffs***"),

by and through their undersigned counsel, Duane Morris LLP, bring suit against Defendants,

DELRAY MEDICAL CENTER, INC. ("***Delray Medical Center***"), a Florida for-profit

corporation, DELRAY MEDICAL CENTER MEDICAL STAFF CORPORATION ("***DMC-***

***MSC***"), a Florida non-profit corporation, NEUROSURGICAL CONSULTANTS OF SOUTH

FLORIDA, LLC D/B/A BRAIN AND SPINE CENTER OF SOUTH FLORIDA ("***Brain and***

***Spine Center***"), a Florida limited liability company, and LLOYD ZUCKER, M.D. ("***Dr. Zucker***"),

an individual (collectively, "**Defendants**"), for injunctive relief and damages, and in support allege as follows:

## NATURE OF THE CASE

1.      This is a civil action arising out of an illegal scheme between and among Delray Medical Center and DMC-MSC (together, the "**DMC**"), on the one hand, and Dr. Zucker and the Brain and Spine Center (together, the "**Zucker Defendants**"), on the other hand, to divert attention from their own illegal activity and stifle competition in the market for neurosurgery in Palm Beach County, Florida and otherwise throughout South Florida by driving Plaintiffs out of business.

2.      Specifically, Delray Medical Center and DMC-MSC each have an improper relationship with the Zucker Defendants that is designed to enrich the Zucker Defendants, Delray Medical Center, and DMC-MSC at the expense of other DMC medical staff and DMC's patients. While DMC pretends to assess eligibility for clinical privileges and Emergency Department ("**ED**") trauma calls based on professional competence and quality of care, DMC secretly assesses and prioritizes economic considerations over all else, and in conjunction with the Zucker Defendants, weaponizes the peer review process to punish DMC medical staff members who complain.

3.      That is exactly what has happened to Dr. Morrison and the Morrison Clinic. Dr. Morrison is a highly competent neurosurgeon with a proven track record of success in both New York and Florida. He was granted clinical privileges at DMC because of his professional competence, but was not permitted access to the desirable ED brain and spine trauma call panel (the "**ED Trauma Call**"). While DMC and the Zucker Defendants made up many false excuses for Dr. Morrison's exclusion, it became evident that he was excluded because he was not economically affiliated with the Zucker Defendants. In addition, Dr. Morrison raised concerns

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

about the Zucker Defendants' practice of diverting Medicaid patients to unaffiliated neurosurgeons, and the inappropriate relationship between the Zucker Defendants and DMC's preferred neurosurgery medical device distributor.

4.    When Dr. Morrison lodged internal reports about all of these issues, Defendants retaliated.  They each and together began a sham peer review process under the false pretenses of reviewing Dr. Morrison's professional competence even though no such review was apparently necessary before Dr. Morrison challenged DMC's unlawful *status quo*.[1]  They then lied to Dr. Morrison in order to fraudulently induce him to resign, and thus constructively discharged Dr. Morrison from the Medical Staff.  To further damage Dr. Morrison and stifle competition in South Florida, Defendants conspired to make a ███████████████████████████████ ███████

5.    Defendants' illegal conduct has damaged Dr. Morrison's ability to practice in Palm Beach County, Florida and elsewhere, and it has further harmed patients, including, but not limited to, Medicaid patients, by reducing choice of and access to quality healthcare.

6.    Plaintiffs therefore bring this action asserting claims for: Breach of Contract (Count I); Violation of the Florida Deceptive and Unfair Trade Practices Act (Count II); Breach of the Implied Covenant of Good Faith and Fair Dealing (Count III); Tortious Interference with Business Relationships (Counts IV-VII); Unfair Competition (Count VIII); Defamation (Count IX); Injurious Falsehood (Count X); Fraudulent Inducement (Count XI); Fraud (Count XII); Civil Conspiracy (Count XIII); and Violation of the False Claims Act (Count XIV).

---

[1] Certain information in this First Amended Complaint has been redacted.  A motion to determine confidentiality and to file under seal the unredacted version of this First Amended Complaint will be filed separately.

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

## PARTIES, JURISDICTION, AND VENUE

7.      Dr. Morrison is over eighteen (18) years of age and is a resident of West Palm Beach, Florida.  Dr. Morrison is a Board certified brain and spine neurosurgeon in Palm Beach County, Florida.  Dr. Morrison is the sole owner of the Morrison Clinic.

8.      The Morrison Clinic is a Florida professional association with its principal place of business located at 2290 10th Ave N., Suite 401, Lake Worth, Florida 33461.  The Morrison Clinic is in the business of providing patients with brain and spine neurosurgery services, and is a top-rated neurosurgery practice in South Florida.

9.      Upon information and belief, Delray Medical Center is a Florida for-profit corporation with its principal place of business located at 5352 Linton Blvd, Delray Beach, Florida 33484.  Delray Medical Center is in the business of providing healthcare services in Palm Beach County, Florida.

10.      Upon information and belief, DMC-MSC is a Florida non-profit corporation with its principal place of business located at 5352 Linton Blvd, Delray Beach, Florida 33484.  DMC-MSC is in the business of establishing the structure and granting clinical privileges for certain Medical Staff working at Delray Medical Center in Palm Beach County.

11.      Upon information and belief, Brain and Spine Center is a Florida limited liability company with its principal place of business located at 4675 Linton Blvd Suite 102, Delray Beach, Florida 33445.  Brain and Spine Center is in the business of providing brain and spine neurosurgical services in Palm Beach County, Florida.

12.      Upon information and belief, Dr. Zucker is over eighteen (18) years of age and is a resident of Boca Raton, Florida, and is otherwise *sui juris*.  Dr. Zucker is a brain and spine

DUANE MORRIS LLP
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

neurosurgeon in Palm Beach County, Florida and is a member of Brain and Spine Center.  Dr. Zucker is the Chief of Neurosurgery at Delray Medical Center.

13.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331.  In addition, this Court can exercise supplemental jurisdiction over Plaintiffs' common law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District.

### GENERAL ALLEGATIONS

#### *Dr. Morrison and the Morrison Clinic*

15.     Dr. Morrison is a Board certified neurosurgeon.  He has demonstrated over several years of practice in New York and South Florida that he possesses specialized expertise in spine surgery, brain surgery, trigeminal neuralgia, spinal fusions, herniated discs, neuro-trauma surgery, peripheral nerve surgery, cerebrovascular, and excision of brain and spine tumors, among other areas of medicine.

16.     Dr. Morrison is certified by the American Board of Neurological Surgery.

17.     Dr. Morrison is one of the very few brain and spine neurosurgeons in the country, and upon information and belief, the only neurosurgeon in Palm Beach County, Florida who has been appointed by the National Football League as an unaffiliated neurotrauma consultant.

18.     Dr. Morrison received his undergraduate degree in Biochemistry from the University of Wisconsin-Madison, and then graduated from Creighton University School of Medicine. Dr. Morrison completed an internship in General Surgery at the Boston University Medical Center, and then completed his residency as the Chief Resident of Neurosurgery at Brown University and the University at Buffalo.  Dr. Morrison then pursued his fellowship in

Cerebrovascular at the University at Buffalo.  Dr. Morrison has also been invited to participate in the Surgical Leadership Program at Harvard Medical School.

19.     Dr. Morrison has been appointed as Associate Professor of Surgery at Nova Southeastern University and also the State University of New York Upstate Medical University.

20.     Dr. Morrison is a member of the executive committee of the American Association of Neurological Surgeons/Congress of Neurological Surgeons ("*AANS/CNS*") Joint Section Committee on Neurotrauma and Critical Care – the neurosurgery equivalent of the American College of Surgeons Committee on Trauma ("*ACSCOT*").

21.     Dr. Morrison has participated in neurotrauma patient management and research for the past seventeen (17) years and continues to be involved in the national and international development and authoring of the AANS/CNS guidelines.

22.     Dr. Morrison has won numerous awards for his abilities both as resident of the month and the year, and "Top Gun" during training, as well as "Top Doctor" awards in practice.

### *Governing DMC Bylaws and Rules and Regulations*

23.     The Bylaws of DMC-MSC dated July 24, 2019 (the "*Bylaws*") set forth the "structure for and the rules of self-governance of the Medical Staff" at Delray Medical Center, and is an enforceable contract between Delray Medical Center on the one hand, and DMC-MSC and its members on the other hand.  *See* **Exhibit A** for a true and correct copy of the DMC-MSC Bylaws, at Article 2.2.

24.     The Bylaws define "Clinical Privileges" as "permission to perform specified diagnostic therapeutic services . . . ."

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

25.     Florida law requires that a hospital governing board's standards and procedures to be applied in determining applications for Clinical Privileges must be available for public inspection.  *See* Fla. Stat. § 395.0191(5).

26.     Article 9.1.3 of the Bylaws sets forth the ground rules for determining whether to grant Clinical Privileges:

> The determination to grant a request for specific Clinical Privileges shall be based on evidence of ***current competence and appropriate training***.  The decision to grant or deny a request for specific Clinical Privileges shall take into account documented ***results of patient care activity***, including Focused Professional Practice Evaluations, Ongoing Professional Practice Evaluations, performance of a sufficient number of procedures to demonstrate and maintain proficiency and, if applicable, reports regarding relevant ***clinical experience*** at other Joint Commission-accredited hospitals or ambulatory care facilities.

**Exhibit A** (emphasis added).

27.     The Bylaws' stated criteria for granting Clinical Privileges do not include any economic considerations.

28.     Article 9.1.4 of the Bylaws provides that, "[i]f privileges are to depend on experience, the application for appointment and privileges shall demonstrate the requisite experience."  **Exhibit A**.

29.     The Bylaws also require that all members of the Medical Staff shall have the duty to "Participate in the on-call roster for the Emergency Department as required by the Board."  Article 8.1.1 of the Bylaws.  This includes the ED Trauma Call department as referred to in this Complaint.

30.     Article 11.23.5 of the Bylaws requires participation in ED call, and the Bylaws do not otherwise disclose any additional criteria for participation in the ED Trauma Call.

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

31.     Article 10.1.1 provides that a "Review" may be undertaken whenever the professional competence or conduct of any Medical Staff Member appears to:

> (a) Compromise or may compromise patient care or safety;
>
> (b) Present a question as to the Member's competence, judgment, ethics, qualifications, ability to work cooperatively with others, or physical or mental health;
>
> (c) Violate his obligations as a member of the Medical Staff or any of the duties and responsibilities imposed pursuant to the Governance Documents; or
>
> (d) Act in a manner detrimental to the operations of the Hospital.

32.     The Bylaws also make clear that a "Review" is different than an "Investigation." The Bylaws provide that a Review is preliminary in nature, and that only after a Review is completed and a department or committee determines that an "Investigation" may be necessary, the Chairperson of the department or committee shall make a written report to the Medical Executive Committee ("**MEC**") outlining the results of the fact-gathering process and request an Investigation.  All requests for an Investigation shall be submitted to the MEC through the Chief of Staff, and shall set forth the specific conduct constituting the need for the Investigation. Alternatively, the MEC may determine to institute an Investigation on its own initiative.  *See* **Exhibit A**, at Article 10.1.2-10.2.

33.     The Bylaws also expressly state in the definition of "Investigation" that "[t]he term does not include . . . an Ongoing Professional Practice Evaluation or Review."  **Exhibit A**, at Article 4.24.  The definition of "Review" is consistent: "a preliminary fact-finding process that may be initiated by a committee or a Department *to determine if an Investigation* concerning a Practitioner's professional competence or conduct *is warranted*."  *Id*. at Article 4.41. The plain language of the Bylaws is thus clear that a Review is different than an Investigation.

DUANE MORRIS LLP
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

34.     The Bylaws set forth additional required elements of an Investigation. For example, if the MEC does not first determine that a request for an investigation is unfounded, then the MEC must "notify the affected Practitioner of the initiation of an investigation." **Exhibit A**, at Article 10.3.

35.     The Bylaws also provide a mechanism for a "Summary Suspension" only "where the failure to take summary action may result in imminent danger to the health or safety of an individual." **Exhibit A**, at Article 10.9.1. While the Bylaws require an investigation before an action is determined with respect to the Summary Suspension, an investigation is not automatic or required in the case of a Summary Suspension, and the required elements of an Investigation (*e.g.*, notice the Practitioner of the initiation of the investigation) continue to apply in the case of a Summary Suspension.

36.     The Chair of the MEC shall also promptly notify the CEO in writing of each request for Investigation received by the MEC and the date of its receipt, and shall keep the CEO fully informed of all communications, meetings, and actions in connection with each request. *See* **Exhibit A** at Article 10.5.

37.     The DMC-MSC's Rules and Regulations, dated March 23, 2022 (the "***Rules and Regulations***") are intended to "further define the general policies contained in the Medical Staff Bylaws," and is an enforceable contract between Delray Medical Center, DMC-MSC, and its members. *See* **Exhibit B** for a true and correct copy of the Rules and Regulations at Article 1.2.

38.     Article 2.2.6 of the Rules and Regulations provides that on-call obligations "should be based on the appointee's clinical privileges," "shall be apportioned equally among all qualified, eligible department members," and the "rules and regulations concerning emergency call obligations must be approved by the Medical Executive Committee and Board." **Exhibit B**.

### *Dr. Morrison's Relationship with DMC*

39.     In the Spring 2019, Dr. Morrison applied to obtain Clinical Privileges at DMC for Neurosurgery and the ED Trauma Call.

40.     Brain and spine trauma and emergency room surgeons and practitioners are vital to the health and wellbeing of patients in need of immediate and severe brain surgery.

41.     Practitioners on the ED Trauma Call are well compensated for their participation and fulfillment of their duties.

42.     At the time of his application, Dr. Morrison was more than qualified.  He had substantial experience and credentials in all core competencies required for such Clinical Privileges, and also had case logs with an even mix of a minimum of 25-30 of certain procedures within the prior twelve (12) month period.

43.     Upon information and belief, at the time that Dr. Morrison applied, the ED Trauma Call consisted of six (6) neurosurgeons on brain and five (5) neurosurgeons on spine, and the vast majority of these neurosurgeons included Dr. Zucker and other members of the Brain and Spine Center controlled and owned by Dr. Zucker.

44.     Upon information and belief, each member of Defendant Brain and Spine Center must pay the Brain and Spine Center any monies received via work performed for DMC, and thus Brain and Spine Center stands to financially gain by increasing the number of its members on the ED Trauma Call.

45.     Upon information and belief, because of Dr. Zucker's ownership interest in Brain and Spine, Dr. Zucker stands to financially gain by increasing the number of Brain and Spine Center members on the ED Trauma Call.

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

46.     On or about October 30, 2019, DMC granted Dr. Morrison's request for Clinical Privileges in Neurosurgery through October 29, 2021.  After being granted Clinical Privileges, Dr. Morrison was directed by Steve Garner to consult with Dr. Zucker regarding Dr. Morrison's application to the ED Trauma Call.  When Dr. Morrison did so, Dr. Zucker, on behalf of himself and Delray Medical Center and DMC-MSC, falsely represented to Dr. Morrison that Dr. Morrison would not be allowed to join the ED Trauma Call because the ED Trauma Call was full and could not accommodate another physician.  Dr. Zucker did not identify any perceived deficiencies in the volume or quality of Dr. Morrison's professional experience or competence as a basis for the denial.

47.     Neither the Bylaws nor the Rules and Regulations limit the number of practitioners to be assigned to the ED Trauma Call, and thus DMC's denial was in breach of the Bylaws.

48.     In addition, Dr. Morrison's Clinical Privileges for Neurosurgery allowed him to perform all of the surgeries necessary for the ED Trauma Call.

49.     In response to the denial, Dr. Morrison made clear that once the panel was no longer "full," he would like to be added.  Dr. Zucker promised Dr. Morrison that he would indeed be considered for the ED Trauma Call during the next contract period in early 2021.

50.     Dr. Morrison also observed that the Zucker Defendants engaged in a practice of diverting patients covered by Medicaid to Dr. Morrison and other neurosurgeons unaffiliated with the Zucker Defendants because these patients were deemed by the Zucker Defendants and DMC to be less lucrative.  Dr. Morrison reported these concerns to several DMC representatives, including, but not limited to, Dr. Tumminia and Dr. Dardano.

51.     Upon information and belief, less than one year after Dr. Morrison was granted Clinical Privileges, in August 2020, Dr. Tim Burke joined the Brain and Spine Center controlled

DUANE MORRIS LLP
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

by Dr. Zucker.  Dr. Burke was then immediately granted Clinical Privileges and was assigned to the ED Trauma Call in contravention of the alleged "full" roster that DMC and Dr. Zucker previously misrepresented to Dr. Morrison.

52.    Although DMC had previously represented that the ED Trauma Call was "full," DMC simply increased the size of the ED Trauma Call in order to accommodate Dr. Burke and the Zucker Defendants.

53.    Upon learning of Dr. Burke's appointment to the ED Trauma Call, Dr. Morrison made reasonable inquiries to understand what happened, but did not receive a coherent or satisfactory response.  Instead, DMC and the Zucker Defendants made up a series of nonsensical excuses that were blatantly inconsistent with the Bylaws and DMC's previous representations to Dr. Morrison.

54.    Dr. Zucker and Dr. Puentes (Chief and Medical Director of Trauma Services) then informed Dr. Morrison that he would not be accepted onto the ED Trauma Call because it was once again full and, for the first time, they claimed that Dr. Morrison did not have a sufficient volume of experience to participate in the ED Trauma Call.

55.    However, this explanation was a pretext.  The ED Trauma Call was obviously not "full" because it was readily expanded to add Dr. Burke.  In addition, it is well known within the neurosurgery community that the procedures performed in "trauma" surgery (those performed on the ED Trauma Call) are more basic and less complicated than the elective procedures that Dr. Morrison was already performing at DMC and elsewhere, on a routine basis.

56.    Dr. Morrison's depth and breadth of practice was, and is, more than sufficient to meet any reasonable objective standard for assignment to a brain and spine trauma call at any

hospital in the United States.  Indeed, at the time, Dr. Morrison had undertaken several hundred cranial and spine surgeries, including many such surgeries in a trauma setting.

57.     Not satisfied with Dr. Zucker's excuses, Dr. Morrison continued to seek answers from DMC.

58.     On June 11, 2021, Dr. Zucker and Dr. Puentes again informed Dr. Morrison that he was not approved for the ED Trauma Call.  Dr. Zucker this time provided three separate reasons for Dr. Morrison's most recent denial: (1) lack of need, *i.e.*, it is "full"; (2) insufficient number and type of cases to demonstrate Dr. Morrison's competency; and (3) an ongoing monitoring and review of Dr. Morrison's status on the Medical Staff.  All of these reasons were misrepresentations designed to mislead Dr. Morrison and cause him to act in reliance on the statements to his detriment.  The first two reasons were pretextual for the reasons stated above.  The new third reason was also a pretext because Dr. Morrison was not aware of such a review, and there was no factual basis for any such review.  Indeed, DMC granted Dr. Morrison's reappointment in or around November 2021, which was several months after Dr. Zucker claimed Dr. Morrison was under Review.

59.     Dr. Zucker was unfairly targeting Dr. Morrison.  In addition to Dr. Morrison's efforts to join the ED Trauma Call and his reports regarding the Zucker Defendants' diversion of Medicaid patients, Dr. Morrison also made reports regarding an inappropriate relationship between DMC's preferred neurosurgery medical device distributor and the Zucker Defendants, as explained in more detail *infra*. Dr. Morrison learned from various sources at DMC that Dr. Zucker began a campaign to target Dr. Morrison and drive Plaintiffs out of the neurosurgery market in South Florida.  For example, upon information and belief, in or around April 2022, Dr. Zucker stated on a DMC NeuroTrauma Committee group call that he would improperly use the peer review process

to target and terminate the clinical privileges of physicians that Dr. Zucker did not like, and at least one participant on that call, and upon information and belief other participants on that call, understood Dr. Zucker to be referencing Dr. Morrison.

60.    On October 13, 2021, Dr. Morrison sent another letter to DMC further inquiring as to the reasons why Dr. Morrison was not allowed to participate on the ED Trauma Call, and continued to state his intention to be added to the ED Trauma Call.

61.    On December 20, 2021, more than two months after Dr. Morrison's October 13 letter, DMC responded through a letter from Dr. Zucker, Dr. Puentes, and DMC's CEO, Maggie Gill.  There, DMC paid lip service to the Bylaws and the Rules and Regulation, but never explained how excluding Dr. Morrison from the ED Trauma Call was consistent with their requirements. The December 20, 2021 letter also vaguely asked Dr. Morrison to "please be assured that decisions about appointment of providers to the Trauma Program (including addition to the ER/Trauma Panel) are well reasoned and based solely upon applicable laws, regulations, standards and Hospital Bylaws."  However, this statement is false as demonstrated herein and was designed to mislead Dr. Morrison and cause him to act in reliance on the statement to his detriment.

62.    The December 20, 2021 letter also incorporated newly-created "qualifications," that were, upon information and belief, created by the Defendants in order to further target Dr. Morrison.  For example, the December 20, 2021 letter's criteria required an "even mix of a minimum of 25-30 of the [five] procedures outlined below on a continuous basis in the prior twelve (12) month period:

> 1. Placement of Intracranial Pressure Monitoring Devices (ICP or Intraventricular Monitors).
>
> 2. Emergency Craniotomy for decompression of SDH, EDH, or ICH.

3. Emergency Craniectomy and subsequent cranioplasty.

4. Emergency Reductions of spine fractures and dislocations with the capability of performing definitive stabilization.

5. Management of Increased ICP secondary to trauma.

63.     Dr. Morrison satisfied all of those requirements when he first applied in 2019, but because he had been unreasonably excluded from the ED Trauma Call since then, the criteria were now impossible for Dr. Morrison to meet.  Defendants acknowledged that point by stating that Dr. Morrison's application was denied because his case mix no longer satisfies the qualifications over the last twelve months – but noting that he practiced at a trauma facility in 2019, less than one year prior to his initial application for clinical privileges at DMC.   Thus, the fraudulent misrepresentations made by Dr. Zucker and other representatives of Delray Medical Center and DMC-MSC identified above damaged Dr. Morrison by delaying his ability to exercise rights under the Bylaws to be included in the ED Trauma Call.

64.     Following the December 20, 2021 letter, Dr. Morrison continued to seek additional information and again sought admission onto the ED Trauma Call.

65.     Dr. Morrison approached the American Board of Neurological Surgery to discuss the unfair treatment by Defendants toward Dr. Morrison, and again communicated with other Department Chairs at DMC.

66.     Dr. Morrison's continued inquiries caused Defendants to become concerned that Dr. Morrison was a threat to their illegal scheme and they plotted retaliation.  Specifically, Dr. Zucker communicated with representatives of Delray Medical Center and DMC-MSC regarding Dr. Morrison, including Dr. Louis Tumminia (DMC Chief of Medical Staff), and upon information and belief other representatives, that Dr. Zucker wanted Dr. Morrison removed from DMC.

Pursuant to this scheme, doctors at DMC were instructed to cut off communication with Dr. Morrison, including, but not limited to, Dr. Anthony Dardano (DMC Chief Medical Officer).

### *Whistleblower Reporting*

67.     The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A) and (B), prohibits offering to pay or paying any remuneration directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person:

> (A)     to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B)     to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

68.     Compliance with the Anti-Kickback Statute is required for reimbursement of claims from federal healthcare programs, and claims made in violation of the law are actionable civilly under the False Claims Act.  42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]").

69.     The Stark Law (42 U.S.C. § 1395nn), among other things, prohibits physicians from referring patients to receive designated health services payable by Medicare or Medicaid from entities with which the physician or an immediate family member has a financial relationship, and prohibits hospitals from submitting claims for federal program payment under these circumstances.

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

70.     During his time working with, for, and at DMC, Dr. Morrison became aware that Dr. Zucker and his wife are financially interested in Guardian Spine ("*Guardian*"), a medical device distribution company that sold medical devices used in neurosurgery.  Dr. Morrison understood that certain of the medical devices distributed by Guardian are the preferred devices for neurosurgery at DMC because the Zucker Defendants have influenced DMC to use such devices.

71.     Upon information and belief, Dr. Zucker's wife is the Guardian sales representative assigned to DMC, and the Zucker Defendants and/or Dr. Zucker's wife own an interest in Guardian.

72.     Upon information and belief, the Zucker Defendants use certain cranial fixation plates sold by Guardian, and influence all other practitioners at DMC to use those cranial fixation plates for all patients, including patients receiving care that was reimbursed and paid for by the Medicare and Medicaid programs.

73.     Upon information and belief, Dr. Zucker's wife, as a Guardian sales representative, received financial compensation for the products used by the Zucker Defendants and other practitioners at DMC.

74.     Upon information and belief, the reason that the Zucker Defendants use, and influence other DMC practitioners to use, the medical devices distributed by Guardian is personal financial gain.

75.     Dr. Morrison was also encouraged to use medical devices distributed by Guardian as the "default" products at DMC.  However, Dr. Morrison felt uncomfortable with the relationship between Guardian and the Zucker Defendants, and believed that the financial relationship and

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

benefits that Dr. Zucker received from his and other DMC practitioners' use of products sold by Guardian caused the hospital to submit false claims for payment from the federal government.

76.     As a result, in an attempt to stop the submission of false claims, Dr. Morrison reported his concerns that DMC was submitting false claims for payment to the federal government to several of his supervisors at DMC, including, but not limited to, the DMC Operating Room Director, Dr. Dardano, Maria Morales, and Dr. Tumminia.

77.     Upon information and belief, Dr. Morrison's concerns were brushed aside and ignored by DMC.

### *Dr. Morrison's Forced Resignation*

78.     On June 2, 2022, Dr. Tumminia sent Dr. Morrison the following e-mail:

> I have been in contact with Dr. Dardano regarding your request to meet with us. He has informed me that this is regarding your desire to join the trauma ER call. Our bylaws state that inclusion in this call requires the approval of the Chairs of Departments of Surgery and Trauma and this is based on need and one's qualifications. The need and qualification is determined by those Chairs, and since this is in our bylaws I nor Dr. Dardano nor the Medical Executive Committee have the authority to override this. Our Suggestion is for you to continue to accrue cases via Locum Tenens and then present this to the Department of Surgery and Trauma chairs in the future.

79.     Dr. Tumminia's e-mail did not make any reference to quality of care issues or other concerns about Dr. Morrison's qualifications, and instead deferred entirely to Dr. Zucker as the Chief of Neurosurgery.

80.     At all relevant times, Dr. Morrison complied with and performed all duties and obligations required under the Bylaws and Rules and Regulations, and met the requirements to be assigned to the ED Trauma Call.

81.     On June 2, 2022, Dr. Morrison responded by lodging a report to Dr. Tumminia and Dr. Dardano that Dr. Zucker was unfairly targeting Dr. Morrison and the Morrison Clinic in order

to drive them out of business and financially benefit Dr. Zucker and the Brain and Spine Center. In addition, Dr. Morrison reported Dr. Zucker's illegal and unethical practices.

82.     Upon information and belief, Defendants secretly responded to Dr. Morrison's report by conspiring to fraudulently induce Dr. Morrison to resign in retaliation for his reports.  As part of this scheme, doctors at DMC who supported Dr. Morrison, including, but not limited to, Dr. Dardano, were instructed to cut off communication with Dr. Morrison as part of the effort to drive Dr. Morrison out of DMC.

83.     Dr. Morrison has learned that, on or about June 23, 2022, the MEC conducted a secret meeting without providing any notice to Dr. Morrison in which they ███████████████

███████████████████████████████████████████████████████████

███████████████████████████

84.     Dr. Morrison was not aware of ████████████████████████

████████████████████████████████████. On the contrary, until Dr. Morrison's June 2, 2022 e-mail, DMC continued to encourage him to treat patients, and especially less lucrative Medicaid patients who Dr. Zucker and his affiliates did not want to treat.

85.     ████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

86.     ████████████████████████████████████

███████████████████████████████████████

████████████████████████████████



DUANE MORRIS LLP
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

92. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

93.     In reliance on DMC's misrepresentations set forth above, Dr. Morrison resigned from Delray Medical Center and DMC-MSC on July 15, 2022.  On the same date, DMC imposed on Dr. Morrison a sham and unenforceable Settlement Agreement.  The Settlement Agreement was procured by fraud and is thus unenforceable. ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

94.     In addition, the Settlement Agreement does not provide Dr. Morrison with any consideration, and is thus also unenforceable for lack of consideration.  DMC had no actual or potential claims against Dr. Morrison that were released or could have been released by virtue of the Settlement Agreement.  In addition, Dr. Morrison received no benefit ███████████████ ████████████.  Section 6 of the Settlement Agreement states: "███████████████ ██████████████████████████████████████ As a result, Dr. Morrison had no influence whatsoever over the content of any ████████████████ ████████████ could not have constituted consideration based on the plain language of the Settlement Agreement.

95.     Dr. Morrison also did not gain the benefit of ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████. Simply put, Dr. Morrison gained nothing

from the Settlement Agreement and it is thus unenforceable.

███████████████████████

96.     The NPDB is a database operated by the United States Department of Health and

Human Services, which contains adverse action reports on health care professionals submitted by

hospitals and state licensing boards.

97.     The NPDB database permits hospitals, state licensing boards, and other authorized

users to request information, adverse action reports, and medical malpractice payment reports on

health care professionals.

98.     ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████

99.     ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

22

███████████████████████████████████████████

████████████████████████████

100.    The falsity of DMC's representations is further demonstrated by a letter issued by DMC on or about October 4, 2022 that stated the following:

> [Dr. Morrison] met the necessary criteria as defined by the Bylaws and approved by the Governing Board and Medical Executive Committee[ and] left the facility in good standing.

101.    █████████████████████████████████████

████████████████████████████████.

102.    █████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

103.    On February 7, 2023, in their response to Dr. Morrison's dispute resolution,

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

104.    Since Dr. Morrison's forced resignation, which was a constructive termination/discharge, Dr. Morrison has also learned that DMC representatives have been spreading false rumors to competing medical facilities disparaging Dr. Morrison's professional

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 · Tel: 305.960.2200

competence in order to prevent Dr. Morrison from finding employment and competing with DMC.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████ These

statements are demonstrably false.

### *Harm to Plaintiffs and Patients*

105.    Defendants each, separately and together, caused at least the following harm to Plaintiffs and patients:

    a.    Denying Dr. Morrison access to the ED Trauma Call in order to benefit the Zucker Defendants;

    b.    Favoring certain physicians for assignment to the ED Trauma Call for economic reasons;

    c.    Requiring trauma patients and consumers to be treated by doctors less qualified than Dr. Morrison for economic reasons, while refusing to allow Dr. Morrison to treat such patients despite being qualified;

    d.    Lessening patient choice by excluding Dr. Morrison from the ED Trauma Call and by driving Dr. Morrison out of DMC entirely

    e.    ████████████████████████████████████████████████

          ███████████████████████████████

    f.    Retaliating against Dr. Morrison for lodging legitimate complaints;

    g.    Fraudulently inducing Dr. Morrison to resign his Clinical Privileges; and

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

      h.     Failing to provide impartial access to care to patients covered by Medicaid in violation of Fla Stat. § 381.026, including that Zucker and other Brain and Spine doctors would decline to treat Medicaid patients by referring them from the ED Trauma Call to non-Brain and Spine doctors, like Dr. Morrison, but retain patients not covered by Medicaid for themselves.

106.    As a member of the DMC Medical Staff in good standing, Dr. Morrison was entitled and qualified to participate on the ED Trauma Call when he first applied in October 2019. Exclusion from the ED Trauma Call for several years in breach of the Bylaws has caused severe financial and other damages to Plaintiffs.

107.    The Defendants' scheme to fraudulently induce Dr. Morrison to surrender his Clinical Privileges has further caused Plaintiffs substantial financial damages.

108.    As an additional result of Defendants' intentional and unlawful conduct, Florida surgery centers and providers have denied staff privileges to Dr. Morrison.

109.    The Defendants' unlawful scheme also harms patients by reducing quality and choice for neurosurgery services in Palm Beach County and throughout South Florida, which also results in higher prices for patients.

110.    The Defendants' unlawful scheme has resulted in at least 156 specific Florida patients lacking access to care because Dr. Morrison is their chosen neurosurgeon and these patients are thus unable to access a hospital because Dr. Morrison was unlawfully driven out of DMC, and the Defendants' conduct has prevented access to other South Florida hospitals because Dr. Morrison has not been able to obtain privileges elsewhere specifically because of the Defendants' conduct.

111.     Dr. Morrison is also one of a very limited number of neurosurgeons in South Florida who treats Medicaid patients, and thus Medicaid patients in South Florida are particularly harmed by Defendants' unlawful scheme through reduced quality and choice for neurosurgery services because Dr. Zucker and other members of Brain and Spine do not provide impartial access to care to Medicaid patients.

112.     In other instances, Plaintiffs have been harmed because specific patients have opted to receive treatment from other neurosurgeons because Dr. Morrison has been blocked from accessing DMC and other hospitals in South Florida as a result of Defendants' unlawful conduct.

113.     Plaintiffs have suffered material and substantial damages, including but not limited to lost revenues, lost business opportunities, deprivation of revenue from the ED Trauma Call, among other sources of damages.

114.     Plaintiffs' business relationships with DMC and their patients have been terminated due to Defendants' unlawful scheme.

### *Exhaustion of Available Remedies*

115.     Dr. Morrison has exhausted all available remedies prior filing this action.

116.     For the reasons stated above, DMC's proceedings and application of the Bylaws and Rules and Regulations to Dr. Morrison were not conducted in accordance with their own stated rules, and were contrary to law.  In addition, the proceedings were based on a false premise of danger to patients that has no factual support, and the outcome of such proceedings was predetermined against Dr. Morrison.

117.     As a result, resort to DMC's internal remedies would have been a useless undertaking, would be meaningless, and would subject to unreasonable delay and hardship to Dr. Morrison.

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

118.    All conditions precedent to bring this action have been satisfied, excused, and/or waived.

### COUNT I
### (BREACH OF CONTRACT)
**Dr. Morrison v. Delray Medical Center, DMC-MSC, and Dr. Zucker**

119.    Plaintiffs adopt, re-allege, and incorporate the allegations contained in paragraphs 1 through 118 in this Complaint as though they are fully set forth herein.

120.    The Bylaws and Rules and Regulations are enforceable contracts between and among the members of the DMC-MSC and Delray Medical Center.  They are supported by consideration.  Their terms are incorporated herein by reference.

121.    At all material times hereto, Delray Medical Center, DMC-MSC, Dr. Zucker, and Dr. Morrison were parties to the agreement set forth in the Bylaws and Rules and Regulations.

122.    The Bylaws expressly obligated DMC-MSC, and Dr. Zucker as Chief of Neurosurgery at DMC, to make determinations for specific Clinical Privileges based on evidence of competence and appropriate training (Article 9.1.3 of the Bylaws).  The Bylaws do not allow for any other considerations for Clinical Privileges.

123.    The Bylaws also require that all members of the Medical Staff shall have the duty to "Participate in the on-call roster for the Emergency Department as required by the Board" (Article 8.1.1 of the Bylaws).  Such on-call roster for the Emergency Department includes the ED Trauma Call.

124.    Article 2.2.6 of the Rules and Regulations provides that on-call obligations "should be based on the appointee's clinical privileges," "shall be apportioned equally among all qualified, eligible department members," and the "rules and regulations concerning emergency call obligations must be approved by the Medical Executive Committee and Board."

125.    At all relevant times, Dr. Morrison complied with and performed all duties and obligations required under the Bylaws and Rules and Regulations, and met the requirements to be assigned to the ED Trauma Call.

126.    Dr. Morrison applied for the ED Trauma Call and was denied in violation of the Bylaws and Rules and Regulations because, among other reasons stated above, Delray Medical Center and the DMC-MSC has not "apportioned equally among all qualified" members appointment to the ED Trauma Call and have instead relied on economic considerations that are not permitted by the Bylaws and the Rules and Regulations.

127.    Delray Medical Center, DMC-MSC, and Dr. Zucker materially breached their respective obligations under the terms of the Bylaws and Rules and Regulations by denying Dr. Morrison assignment to the ED Trauma Call based on economic considerations.

128.    Delray Medical Center, DMC-MSC, and Dr. Zucker materially breached their obligations under the terms of the Bylaws and Rules and Regulations by denying Dr. Morrison's attempts to fulfill his duties and obligations of participating in the ED Trauma Call, and did not apportion the on-call obligations equally among all qualified, eligible department members.

129.    In addition, and as set forth above in the section titled "Dr. Morrison's Forced Resignation," Delray Medical Center and DMC-MSC have also materially breached their obligations under the terms of the Bylaws and Rules and Regulations by constructively terminating Dr. Morrison's Clinical Privileges without affording the required good faith due process.

130.    As a direct and proximate result of the breaches of the Bylaws and Rules and Regulations, Dr. Morrison has suffered and will continue to suffer damages, to which he is entitled to recover.

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

## COUNT II
## (VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)
### All Plaintiffs v. All Defendants

131.    Plaintiffs adopt, re-allege, and incorporate the allegations contained in paragraphs 1 through 118 in this Complaint as though they are fully set forth herein.

132.    This is an action for violations of Fla. Stat. § 501.204(1) which states, in relevant part: "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

133.    As set forth herein, Defendants each, separately and together, committed the following deceptive and unfair trade practices:

a.  Denying Dr. Morrison access to the ED Trauma Call in order to benefit the Zucker Defendants;

b.  Favoring certain physicians for assignment to the ED Trauma Call for economic reasons;

c.  Requiring trauma patients and consumers to be treated by doctors less qualified than Dr. Morrison for economic reasons, while refusing to allow Dr. Morrison to treat such patients despite being qualified;

d.  Lessening patient choice by excluding Dr. Morrison from the ED Trauma Call;

e.  ████████████████████████████████████████████████████████████████
    ███████████████████████████████

f.  Retaliating against Dr. Morrison for lodging legitimate complaints;

g.  Fraudulently inducing Dr. Morrison to resign his Clinical Privileges; and

h.  Failing to provide impartial access to care to patients covered by Medicaid in violation of Fla Stat. § 381.026, including Zucker's and other Brain and Spine

DUANE MORRIS LLP
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 · Tel: 305.960.2200

doctors' refusal to treat Medicaid patients by referring them from the ED Trauma

Call to non-Brain and Spine doctors, like Dr. Morrison, but retaining patients not

covered by Medicaid for themselves.

134.    Defendants' deceptive and unfair acts and practices affect trade in Florida's

healthcare markets, resulting in fewer alternatives and higher prices for consumers, who are

patients in need of trauma care and neurosurgery services.

135.    Defendants have engaged in representations, acts, practices, or omissions, which

are material and have substantially harmed consumers in Florida.

136.    Defendants have committed acts or practices in trade or commerce which offend

established public policy and are unethical, oppressive, unscrupulous or substantially injurious to

consumers like Plaintiff.

137.    Plaintiffs are competitors of Defendants.

138.    As a result of Defendants' unfair and deceptive trade practices, Plaintiffs have

suffered material and substantial damages, including but not limited to lost revenues, lost business

opportunities, deprivation of revenue from the ED Trauma Call, among other sources of damages.

Additional details regarding the harm to Plaintiffs is set forth above in the section titled "Harm to

Plaintiffs and Patients."

139.    Defendants' unfair and deceptive trade practices have also severely harmed

consumers of healthcare services by reducing quality and choice and by denying impartial access

to care to patients in violation of Fla Stat. § 381.026.  Additional details regarding the harm to

healthcare consumers is set forth above in the section titled "Harm to Plaintiffs and Patients."

140.    Thus, Defendants have engaged in unfair and deceptive acts or practices in the

conduct of any trade or commerce in violation of Fla. Stat. § 501.201(1).

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

## <u>COUNT III</u>
**(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**
**Dr. Morrison v. Delray Medical Center, DMC-MSC, and Dr. Zucker**

141.    Plaintiffs adopt, re-allege, and incorporate the allegations contained in paragraphs 1 through 118 in this Complaint as though they are fully set forth herein.

142.    This is an action for breach of the implied covenant of good faith and fair dealing under Florida law.

143.    Implied into the Bylaws and Rules and Regulations is a covenant of good faith and fair dealing whereby none of the parties would act in bad faith or deal unfairly so as to deprive the other party of the benefits of the Bylaws and Rules and Regulations.

144.    Dr. Morrison has performed all the promises, covenants, and conditions required on his part under the Bylaws and Rules and Regulations.

145.    By engaging in the unfair and bad faith conduct as alleged herein, DMC and Dr. Zucker have breached the covenant of good faith and fair dealing implied in the Bylaws and Rules and Regulations, including, but not limited to, their express violation of Sections 9.1.3, 8.1.1, and 2.2.6 of the Bylaws.

146.    In addition, Delray Medical Center, DMC-MSC, and Dr. Zucker breached the covenant of good faith and fair dealing by exercising their discretion pursuant to the Bylaws in a manner that contravened Dr. Morrison's reasonable expectations, including by implementing procedures against Dr. Morrison without a reasonable factual basis to do so.

147.    For example, Delray Medical Center, DMC-MSC, and Dr. Zucker exercised improper abuse of discretion and thus failed to act in good faith in denying Dr. Morrison appointment to the ED Trauma Call without regard for the requirements set forth in the Bylaws,

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

Rules and Regulations, and the alleged ED Trauma Call policies that DMC has from time-to-time articulated to Dr. Morrison.

148.    By way of another example, Delray Medical Center and DMC-MSC exercised improper abuse of discretion and thus failed to act in good faith by initiating a sham Review of Dr. Morrison's professional competence without evidentiary support, and by constructively terminated Dr. Morrison's Clinical Privileges by fraud and coercion.

149.    As a direct and proximate result of the breach by Delray Medical Center, DMC-MSC, and Dr. Zucker of the implied covenant of good faith and fair dealing, Dr. Morrison has and will continue to suffer actual damages.

## COUNT IV
### (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS – INJUNCTION – THE MORRISON CLINIC PATIENTS)
### All Plaintiffs v. All Defendants

150.    Plaintiffs adopt, re-allege, and incorporate the allegations contained in paragraphs 1 through 118 in this Complaint as though they are fully set forth herein.

151.    This is an action for tortious interference with advantageous business relationships under Florida law.

152.    At all times relevant hereto, Plaintiffs enjoyed advantageous business relationships with their patients at the Morrison Clinic.

153.    Defendants were aware and had knowledge of Plaintiffs' business relationships with their patients, and Defendants specifically targeted those patient relationships through their scheme against Dr. Morrison.

154.    Defendants, each and together, intentionally and unjustifiably interfered with and/or disrupted Plaintiffs' business relationships with their patients by, among other things, fraudulently inducing Dr. Morrison to resign ███████████████████████████████

DUANE MORRIS LLP
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

█████████████████████████████████████ which have caused Dr. Morrison to be unable to treat certain of his patients.

155.    Upon information and belief, Defendants specifically targeted Dr. Morrison's patients and acted with malice and the intent to injure Plaintiffs' relationship with their patients when they initiated sham procedures against Dr. Morrison, forced Dr. Morrison to resign, and otherwise engaged in the unlawful conduct described above.

156.    Defendants were not privileged to interfere because they employed improper means, including, among other things, fraud and misrepresentations as set forth above, to interfere with Plaintiffs' relationships with Morrison Clinic patients.

157.    These patients would not have terminated their business relationships with Plaintiffs, but for Defendants' intentional interference.

158.    Additionally, Dr. Morrison is not able to treat his patients due to being denied use of hospital facilities as a result of Defendants' conduct.

159.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and will continue to suffer irreparable injury.

160.    Unless Defendants are enjoined from continuing to tortiously interfere with Plaintiffs' business relationships with their patients, Plaintiffs will suffer further immediate, irreparable injury.

161.    Plaintiffs lack an adequate remedy at law to prevent Defendants from continuing to tortiously interfere with Plaintiffs' business relationships.

162.    Plaintiffs have a substantial likelihood of success on the merits of their claim, and injunctive relief would serve the public interest.

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

<u>**COUNT V**</u>
**(TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS –
DAMAGES – THE MORRISON CLINIC PATIENTS)
All Plaintiffs v. All Defendants**

163.    Plaintiffs adopt, re-allege, and incorporate the allegations contained in paragraphs
1 through 118 in this Complaint as though they are fully set forth herein.

164.    This is an action for tortious interference with advantageous business relationships
under Florida law.

165.    At all times relevant hereto, Plaintiffs enjoyed advantageous business relationships
with their patients at the Morrison Clinic.

166.    Defendants were aware and had knowledge of Plaintiffs' business relationships
with their patients, and Defendants specifically targeted those patient relationships through their
scheme against Dr. Morrison.

167.    Defendants, each and together, intentionally and unjustifiably interfered with
and/or disrupted Plaintiffs' business relationships with their patients by, among other things,
fraudulently inducing Dr. Morrison to resign ███████████████████████████
███████████████████████████ which have caused Dr. Morrison to be unable
to treat certain of his patients.

168.    Upon information and belief, Defendants specifically targeted Dr. Morrison's
patients and acted with malice and the intent to injure Plaintiffs' relationship with their patients
when they initiated sham procedures against Dr. Morrison, forced Dr. Morrison to resign, and
otherwise engaged in the unlawful conduct described above.

169.    Defendants were not privileged to interfere because they employed improper means
to interfere with Plaintiffs' relationships with Morrison Clinic patients.

170.     Plaintiffs' patients would not have terminated their business relationships with Plaintiffs, but for Defendants' intentional interference.

171.     Additionally, Dr. Morrison is not able to treat his patients due to being denied use of hospital facilities as a result of Defendants' conduct.

172.     As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and will continue to suffer substantial damages as alleged herein.

<u>COUNT VI</u>
**(TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS –
DAMAGES – RELATIONSHIP WITH DMC)
All Plaintiffs v. Zucker Defendants**

173.     Plaintiffs adopt, re-allege, and incorporate the allegations contained in paragraphs 1 through 118 in this Complaint as though they are fully set forth herein.

174.     This is an action for tortious interference with prospective business relationships under Florida law.

175.      At all times relevant hereto, Plaintiffs enjoyed an advantageous business relationship with DMC-MSC and DMC.  Dr. Morrison's relationship with these entities was as part of its active Medical Staff and treating patients at DMC.  The Morrison Clinic's relationship was through the treatment of Morrison Clinic patients at DMC.

176.     The Zucker Defendants were aware and had knowledge of Plaintiffs' business relationships with DMC and DMC-MSC, and the Zucker Defendants specifically targeted those relationships through their scheme against Dr. Morrison.

177.     Upon information and belief, the Zucker Defendants, each and together, intentionally and unjustifiably interfered with and/or disrupted Plaintiffs' business relationships with DMC by, among other things, acting jointly with and influencing DMC to fraudulently induce Dr. Morrison to resign, unlawfully preventing Dr. Morrison from access to the ED Trauma Call,

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

creating a hostile work environment designed to force Dr. Morrison out of the Palm Beach County neurosurgery market, ███████████████████████████████████████ ████████████████████████████████████████████ all of which led to the constructive termination of Dr. Morrison's relationship with DMC.

178.    Upon information and belief, the Zucker Defendants acted with malice and intent to injure Plaintiffs by driving Plaintiffs out of the South Florida neurosurgery market.

179.    The Zucker Defendants were not privileged to interfere because they employed improper means to interfere with Plaintiffs' relationship with DMC-MSC and Delray Medical Center.

180.    Plaintiffs' business relationship with DMC would not have been terminated but for the Zucker Defendants' intentional interference.

181.    As a direct and proximate result of the Zucker Defendants' actions, Plaintiffs have suffered and will continue to suffer substantial damages as alleged herein.

<u>**COUNT VII**</u>
**(TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS –
INJUNCTION – RELATIONSHIP WITH DMC)**
**All Plaintiffs v. Zucker Defendants**

182.    Plaintiffs adopt, re-allege, and incorporate the allegations contained in paragraphs 1 through 118 in this Complaint as though they are fully set forth herein.

183.    At all times relevant hereto, Plaintiffs enjoyed an advantageous business relationship with DMC, as part of its active Medical Staff and treating patients at DMC.

184.    The Zucker Defendants were aware and had knowledge of Plaintiffs' business relationships with DMC, and the Zucker Defendants specifically targeted that relationship through their scheme against Dr. Morrison.

185.     Upon information and belief, the Zucker Defendants, each and together, intentionally and unjustifiably interfered with and/or disrupted Plaintiffs' business relationships with DMC by, among other things, acting jointly with and influencing DMC to fraudulently induce Dr. Morrison to resign, unlawfully preventing Dr. Morrison from access to the ED Trauma Call, creating a hostile work environment designed to push Dr. Morrison out of the Palm Beach County neurosurgery market, ████████████████████████████████████ ████████████████████████████████████ all of which led to the constructive termination of Dr. Morrison's relationship with DMC.

186.     The Zucker Defendants were not privileged to interfere because they employed improper means to interfere with Plaintiffs' relationship with DMC.

187.     Plaintiffs' business relationship with DMC would not have been terminated but for the Zucker Defendants' intentional interference.

188.     As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and will continue to suffer irreparable injury.

189.     Unless Defendants are enjoined from continuing to tortiously interfere with Plaintiffs' business relationships with their patients, Plaintiffs will suffer further immediate, irreparable injury.

190.     Plaintiffs lack an adequate remedy at law to prevent Defendants from continuing to tortiously interfere with Plaintiffs' business relationships.

191.     Plaintiffs have a substantial likelihood of success on the merits of their claim, and injunctive relief would serve the public interest.

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

## COUNT VIII
## (UNFAIR COMPETITION)
### All Plaintiffs v. All Defendants

192.    Plaintiffs adopt, re-allege, and incorporate the allegations contained in paragraphs 1 through 118 in this Complaint as though they are fully set forth herein.

193.    Each of the Defendants compete with the Plaintiffs in the relevant market for neurosurgery services in Palm Beach County.

194.    Defendants' misconduct alleged herein constitutes unfair competition under Florida law.

195.    The details surrounding Defendants' unlawful conduct are set forth above, but by way of example and upon information and belief, Defendants engaged in unfair competition by conspiring to ███████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████ and then use fraud to coerce Dr. Morrison to resign.  Upon information and belief, Defendants have individually and in concert also attempted to ruin Dr. Morrison's reputation by lying to potential and actual patients of Plaintiffs that ████████████ ████████████████████████████████████████████████ Defendants engaged in this conduct because financial factors govern their decisions regarding physician privileges in violation of their own Bylaws.  Defendants have thus used and abused available procedures and then extended their conduct beyond such procedures in order to drive Plaintiffs out of business.

196.    Defendants have engaged in unlawful practices, unfair methods of competition, and unconscionable, deceptive and unfair trade practices in violation of Plaintiffs' rights under Florida common law.

38

197.   Defendants' unlawful practices have harmed and will continue to substantially harm Florida consumers and patients.

198.   As a direct and proximate cause of Defendants' misconduct, Plaintiffs have suffered and will continue to suffer actual damages.

**COUNT IX**
**(DEFAMATION)**
**All Plaintiffs v. All Defendants**

199.   Plaintiffs adopt, re-allege, and incorporate the allegations contained in paragraphs 1 through 118 in this Complaint as though they are fully set forth herein.

200.   This is an action for defamation under Florida law.

201.   ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

202.   ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

203.   ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

██████████████████████████████████████████████████████

████████████████████████████████████ .

204.    █████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

205.    █████████████████████████████████████████

████████████████████████████████████

206.    █████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

207.    █████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████

208.    Defendants acted intentionally and with malice with respect to this sensitive matter concerning Dr. Morrison, a private person.

209.    █████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

210.    As a result of Defendants' actions, Plaintiffs have suffered actual damages.

211.    █████████████████████████████████████████

██████████████████████████████████████████████████████

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 · Tel: 305.960.2200



214.    DMC made such false statement without reasonable care as to the truth or falsity of such statement.

215.    DMC's representatives knew these claim were false, but made the statements with malice and an intent to injure Dr. Morrison in order to further prevent Plaintiffs from operating in South Florida.

216.    Upon information and belief, one or more patients of Plaintiffs relied on this false statement in making medical care decisions and/or terminated their relationship with Plaintiff.

217.    As a result of Defendants' defamation, Plaintiffs have suffered and will continue to suffer actual damages.

**COUNT X**
**(INJURIOUS FALSEHOOD)**
**All Plaintiffs v. All Defendants**

218.    Plaintiffs adopt, re-allege, and incorporate the allegations contained in paragraphs 1 through 118 in this Complaint as though they are fully set forth herein.

219.    This is an action for injurious falsehood under Florida law.

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 · Tel: 305.960.2200

220. 

221.

222.

223.

224.

225.

226.

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

227.



230.    DMC made such false statement without reasonable care as to the truth or falsity of such statement.

231.    Upon information and belief, patients of Plaintiffs relied on this false statement in making medical care decisions and, in fact, terminated their relationship with Plaintiff.

232.



233.    Plaintiffs had a property interest in Dr. Morrison's ability and license to treat patients, which has been damaged as a result of Defendants' actions.

234.    As a result of Defendants' actions, Plaintiffs have suffered actual damages, and loss of future economic expectations from operating and practicing medicine, which cannot be

DUANE MORRIS LLP
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 · Tel: 305.960.2200

explained by any factors other than those directly caused by Defendants' false statements, ██

████████████████████████████

235.    Plaintiffs have experienced specific lost revenue as a result of a specific patients that have opted to receive treatment from other neurosurgeons only after Dr. Morrison was not able to treat such patients at DMC or another hospital in South Florida, and these patients have informed Dr. Morrison that opted for alternative neurosurgeons specifically for this reason.

236.    ████████████████████████████████████

████████████████████████████████████

████████████████████████████

237.    ████████████████████████████████████

██████████████████████████████████

238.    As a result of Defendants' defamation, Plaintiffs have suffered and will continue to suffer actual damages.

## COUNT XI
### (FRAUDULENT INDUCEMENT INTO AGREEMENT)
### All Plaintiffs v. Delray Medical Center and DMC-MSC

239.    Plaintiffs adopt, re-allege, and incorporate the allegations contained in paragraphs 1 through 118 in this Complaint as though they are fully set forth herein.

240.    This is an action for fraud under Florida law.

241.    As set forth herein, Delray Medical Center and DMC-MSC made a series of misrepresentations, which DMC knew to be false, to Plaintiffs in order to induce acceptance of the Settlement Agreement.

242.    On July 7, 2022, a Delray Medical Center and DMC-MSC representative, Laurie Stern Torban, engaged in discussions with Plaintiffs' representative, Tim Monaghan, in which she

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 · Tel: 305.960.2200

falsely asserted that ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

     243.    Dr. Morrison relied on the false premise presented by Delray Medical Center and DMC-MSC. ██████████████████████████████████

████████████████████████████████████████████████

████

     244.    Delray Medical Center and DMC-MSC never corrected the false statements made by Ms. Torban and Mr. Goldberg and instead continued to pressure Dr. Morrison to resign and settle under the false premise ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

     245.    In reliance on Delray Medical Center's and DMC-MSC's misrepresentations set forth above, Dr. Morrison resigned from Delray Medical Center and DMC-MSC on July 15, 2022. On the same date, Delray Medical Center and DMC-MSC imposed on Dr. Morrison a sham and unenforceable Settlement Agreement.  The Settlement Agreement was procured by fraud and is thus unenforceable. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

███████████████████████████████████████████████████████

████████████████████████████████████████████████

246.     Delray Medical Center's and DMC-MSC's misrepresentations were intended to and did induce Plaintiffs to submit a resignation letter and sign the unenforceable Settlement Agreement that was procured by fraud.

247.     Plaintiffs relied upon Delray Medical Center's and DMC-MSC's misrepresentations in surrendering Dr. Morrison's privileges and discontinuing his practice of medicine at DMC, by signing the unenforceable Settlement Agreement that was procured by fraud.

248.     As a result of Delray Medical Center's and DMC-MSC's series of fraudulent misrepresentations, Plaintiffs seek rescission of the Settlement Agreement.  Plaintiffs have not ever requested damages specifically in connection with Defendants' fraudulent inducement to enter the Settlement Agreement.

## COUNT XII
### (FRAUD)
**All Plaintiffs v. All Defendants**

249.     Plaintiffs adopt, re-allege, and incorporate the allegations contained in paragraphs 1 through 118 in this Complaint as though they are fully set forth herein.

250.     This is an action for fraud under Florida law.

251.     As set forth herein, Defendants each made a series of misrepresentations, which Defendants knew to be false, to Plaintiffs.  The details are set forth at greater length above, but by way of example, Defendants individually and together lied to Dr. Morrison regarding his ability to join the ED Trauma Call and thus induced Dr. Morrison to spend time focused on his practice at Delray Medical Center and DMC-MSC when he could have alternatively pursued a successful practice at another hospital.  Defendants falsely represented to Dr. Morrison through their

DUANE MORRIS LLP
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

endorsement of the Bylaws that Delray Medical Center and DMC-MSC do not engage in economic credentialing or otherwise use financial considerations to determine issues related to patient care, including assignment of neurosurgeons to the ED Trauma Call.  Dr. Zucker, Dr. Tumminia, and other Delray Medical Center and DMC-MSC representatives also verbally and in writing affirmed these policies to Dr. Morrison.  However, these representations were false because Defendants have conspired to engage in patient care decisions based on financial factors.

252.    Defendants' respective misrepresentations, as set forth herein, were intended to and did induce Plaintiffs to continue to practice medicine at Delray Medical Center and DMC-MSC and to forgo other opportunities that would compete with Defendants for years.

253.    Plaintiffs relied upon Defendants' respective misrepresentations in continuing to practice medicine at Delray Medical Center and DMC-MSC and forgo other opportunities that would compete with Defendants.

254.    As a result of Defendants' respective fraudulent misrepresentations, Plaintiffs have suffered damages.

## COUNT XIII
### (CIVIL CONSPIRACY)
### All Plaintiffs v. All Defendants

255.    Plaintiffs adopt, re-allege, and incorporate the allegations in paragraphs 1 through 118 in this Complaint as though they are fully set forth herein.

256.    This is an action for civil conspiracy under Florida law.

257.    As set forth herein, Defendants each reached an agreement to act, and then did so act, in concert to unlawfully target Plaintiffs and drive them out of business.  The causes of action outlined herein form the basis of this conspiracy count.

258.    The wrongful acts forming the basis of the conspiracy are set forth in the sections above titled "Dr. Morrison's Relationship with DMC" and ███████████████████

259.    As a result of Defendants' conspiracy, Plaintiffs have suffered damages.

### COUNT XIV
### (PRIVATE CAUSE OF ACTION PURSUANT TO THE FALSE CLAIMS ACT - 31 U.S.C. § 3730)
### Dr. Morrison v. Delray Medical Center and DMC-MSC

260.    Plaintiffs adopt, re-allege, and incorporate the allegations contained in paragraphs 1 through 118 in this Complaint as though they are fully set forth herein.

261.    At all times material hereto, Dr. Morrison was an employee, contractor, and/or agent of Delray Medical Center and DMC-MSC covered by 31 U.S.C. § 3730(h). Section 3730(h) precludes retaliation, suspension, threats, harassment and other discriminatory conduct against employees, contractors and/or agents who investigate, provide testimony or assistance in any action filed or to be filed under the FCA or make any efforts to stop one or more violations of the FCA.

262.    Dr. Morrison became aware of potential misconduct by the Zucker Defendants, Delray Medical Center and DMC-MSC in connection with the relationship of the Zucker Defendants to Guardian and the use of medical devices sold by Guardian at Delray Medical Center.

263.    Dr. Morrison engaged in activity protected under the statute by reporting these concerns, which could reasonably constitute violations of Medicare and Centers for Medicare & Medicaid Services ("CMS") regulations, the Anti-Kickback Statute, and the Stark Law.

264.    Dr. Morrison engaged in activity protected under the FCA by voicing concerns to DMC that their agents engaged in conduct that could reasonably lead Delray Medical Center and DMC-MSC to misrepresent and falsely present claims for reimbursement.

265.    Dr. Morrison in good faith believed that the actions of certain of Defendants' agents, contractors, and employees violated Medicare and CMS regulations, the Anti-Kickback Statute, and the Stark Law, among other things.

266.    Delray Medical Center and DMC-MSC, including and through its leadership and members, including Dr. Zucker, knew that Dr. Morrison engaged in the protected activity.

267.    The threats, suspension, harassment, constructive discharge, and constructive termination, as set forth above, were in violation of 31 U.S.C. § 3730(h).

268.    As a direct and proximate result of the threats, suspension, harassment, constructive discharge, and constructive termination by Delray Medical Center and DMC-MSC, Dr. Morrison suffered and incurred, and continues to suffer and incur, loss of compensation and other benefits, harm and damage to reputation and emotional distress.

269.    Delray Medical Center's and DMC-MSC's conduct was and is malicious, fraudulent and oppressive in violation of public policy and in violation of 31 U.S.C. § 3730(h).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants, alternatively and/or cumulatively, as follows:

a)  for a permanent injunction on all counts where available requiring:

████████████████████████████████

2.  DMC to reinstate Dr. Morrison's Clinical Privileges and appoint Dr. Morrison to the ED Trauma Call;

████████████████████████████████████████████

4.  DMC and Dr. Zucker to cease and desist from any further breaches of contract against Dr. Morrison;

49

5.   the Zucker Defendants to cease and desist any interference with Plaintiffs'
relationships with DMC; and

6.   Defendants to cease and desist from interfering with Plaintiffs' relationships
with their patients;

b)   for rescission of the Settlement Agreement;

c)   for general damages and losses;

d)   for special damages in an amount to be determined at the time of trial;

e)   for an award of compensatory, consequential, and statutory damages;

f)   for any and all relief available pursuant to 31 U.S.C. § 3730(h), including but not
limited to, two times the amount of back pay, interest on back pay, any and all other
compensatory and special damages;

g)   for any and all relief available pursuant to § 501.201 *et seq.*, Florida Statutes (2015)
and 31 U.S.C. § 3730(h), including, but not limited to, attorneys' fees and costs;

h)   for pre-judgment interest at the applicable statutory rate;

i)   costs and expenses of this suit; and

j)   for such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand trial by jury on all issues so triable.


Dated this 26th day of May, 2023

*/s/ Julian A. Jackson-Fannin*
Harvey W. Gurland, Jr., Esq.
Florida Bar No. 284033
Julian A. Jackson-Fannin, Esq.
Florida Bar No. 93220
201 South Biscayne Boulevard
Suite 3400
Miami, FL 33131-2318

Telephone: 305.960.2214
HWGurland@duanemorris.com
JJFannin@duanemorris.com
PNMendoza@duanemorris.com
JMagarin@duanemorris.com

and

Sean S. Zabaneh
(*pro hac vice* forthcoming)
Andrew J. Rudowitz
(*pro hac vice* forthcoming)
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA  19103-4196
Telephone:  215-979-1000
sszabaneh@duanemorris.com
ajrudowitz@duanemorris.com


*Counsel for Plaintiffs*
*John F. Morrison, M.D. and the*
*Morrison Clinic, P.A.*

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200