UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CV-80512-BER

JOHN F. MORRISON, M.D. and
MORRISON CLINIC, P.A.,

Plaintiffs,

v.

DELRAY MEDICAL CENTER, INC., et. al.

Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS (ECF No. 117)

Plaintiffs Dr. John Morrison and his medical practice, Morrison Clinic, P.A., (collectively "Dr. Morrison") sue Delray Medical Center, Inc. ("the Hospital" or "DMC") for breach of contract (Count I), FDUTPA (Count II), breach of implied covenant of good faith and fair dealing (Count III), tortious interference with prospective business relationships (Counts IV and V), unfair competition (Count VIII), defamation (Count IX), injurious falsehood (Count X), fraudulent inducement (Count XI), fraud (Count XII), civil conspiracy (Count XIII), and retaliation for protected activity under the False Claims Act (Count XIV). ECF Nos. 52 (redacted Amended Complaint), 166 (revised redactions), 57 (sealed, unredacted).[1]

_____

[1] On April 12, 2024, I reconsidered my prior orders allowing the parties to file certain documents under seal, which resulted in some filings being unsealed entirely and for those that remained sealed, significantly reducing the scope of the information that could be redacted. ECF Nos. 156, 157. In accordance with my order, counsel refiled

The Hospital's Answer to the Amended Complaint asserted 38 affirmative defenses.  ECF Nos. 65 (redacted Answer), 161 (revised redactions), 69 (sealed, unredacted). As relevant here, the Twenty-Fifth Affirmative Defense says, "Plaintiffs' claims are barred, in whole or in part, by the release of such claims in a Settlement Agreement." ECF No. 65 at 48. Without waiving its argument that Dr. Morrison's claims were released under the Settlement Agreement, the Hospital asserted, in the alternative, counterclaims against Dr. Morrison for fraudulent inducement and fraudulent misrepresentation. ECF No. 65 at 51-65.

The Hospital moves for judgment on the pleadings on Counts II, IV, V, VIII, IX, X and XIII of the Amended Complaint. ECF Nos. 117 (redacted), 162 (revised redactions), 119-1 (sealed, unredacted). The Hospital says that Dr. Morrison released these claims as part of a settlement agreement in July 2022.

Dr. Morrison says the Hospital fraudulently induced him into the settlement agreement, so it should be rescinded. Alternatively, he argues that the settlement agreement is unenforceable because there was no consideration for the release. Finally, he says issues of fact preclude a judgment on the pleadings. ECF Nos. 121 (redacted), 168 (revised redactions), 124 (sealed, unredacted).

The Hospital says Dr. Morrison's assertion that he was fraudulently induced to sign the settlement agreement fails as a matter of law and as a matter of fact, that

---

these documents with limited redactions.  ECF Nos. 159-163, 165-168.

Dr. Morrison is estopped from seeking rescission, that there was valid consideration for the settlement agreement, and that there are no disputed material facts.

I have reviewed the Amended Complaint, the Answer, the Motion, the Response, the Reply [ECF No. 133-1], the Sur-Reply [ECF No. 137] and the Sur-Sur-Reply [ECF No. 140]. I held an oral argument on March 20, 2024. I am fully advised and this matter is ripe for decision. For the following reasons, the Motion for Judgment on the Pleadings is GRANTED IN PART.

## JUDGMENT ON THE PLEADINGS

In *ConSeal Int'l Inc. v. Neogen Corp.,* Judge Bloom thoroughly explained the law that applies to a Motion for Judgment on the Pleadings:

> Federal Rule of Civil Procedure 12(c) states that: "After the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001); *see also Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014); *Palmer & Cay, Inc. v. Marsh & McLennan Cos.*, 404 F.3d 1297, 1303 (11th Cir. 2005); *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1291 (11th Cir. 2002). "A motion for judgment on the pleadings admits the plaintiff's factual allegations and impels the district court to reach a legal conclusion based on those facts." *Gachette v. Axis Surplus Ins. Co.*, No. 19-cv-23680, 2020 WL 2850587, at *1 (S.D. Fla. Apr. 1, 2020) (quoting *Dozier v. Prof'l Found. for Heath Care, Inc.*, 944 F.2d 814, 816 (11th Cir. 1991)).
>
> "Judgment on the pleadings is appropriate only when a party 'fails to offer any pertinent defense,' not when one defense out of many is challenged." *Pete Vicari Gen. Contractor LLC v. Ohio Cas. Ins. Co.*, No. 17-23733-CIV, 2018 WL 6308695, at *1 (S.D. Fla. Sept. 27, 2018) (quoting *Vann v. Inst. of Nuclear Power Operations, Inc.*, No. 1:09-cv-1169-CC-LTW, 2010 WL 11601718, at *2 (N.D. Ga. July 15, 2010)). Indeed, "federal courts are unwilling to grant a judgment under Rule

12(c) unless it is clear that the merits of the controversy can be fairly and fully decided in this summary manner." *Id.* (internal quotation marks omitted). However, "[i]f it is clear from the pleadings that the plaintiff is not entitled to relief under any set of facts consistent with the complaint, the district court should dismiss the complaint." *King v. Akima Glob. Servs., LLC*, 775 F. App'x 617, 620 (11th Cir. 2019) (citing *Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir. 2002)); *cf. United States v. Khan*, No. 3:17-cv-965-J-PDB, 2018 WL 6308678, at *1 (M.D. Fla. Sept. 26, 2018) ("A court must deny a motion for judgment on the pleadings if a 'comparison of the averments in the competing pleadings reveals a material dispute of fact.' " (quoting *Perez*, 774 F.3d at 1335)).

In rendering judgment, a court may consider the substance of the pleadings and any judicially noticed facts. *Cunningham v. Dist. Attorney's Office for Escambia Cty.*, 592 F.3d 1237, 1255 (11th Cir. 2010); *see also Melendez v. Bank of Am. Corp.*, No. 17-cv-60542, 2018 WL 1092546, at *1 (S.D. Fla. Feb. 2, 2018) ("The Court may consider all of the pleadings, including the complaint, answer, counterclaim, and answer to the counterclaim." (citing *Fla. Evergreen Foliage v. E.I. DuPont de Nemours & Co.*, 165 F. Supp. 2d 1345, 1350 (S.D. Fla. 2001))). "Pleadings include the complaint and answer. Written instruments that are exhibits to a pleading are considered a part of the pleading." *Pyure Brands, LLC v. Nascent Health Sci. LLC*, No. 1:18-cv-23357, 2019 WL 7945226, at *2 (S.D. Fla. Mar. 4, 2019) (citing Fed. R. Civ. P. 7(a); Fed. R. Civ. P. 10(c). "A court may consider documents attached to the complaint or incorporated by reference without converting the motion into a motion for summary judgment if the documents are: (1) central to the complaint, and (2) the documents' authenticity is not in dispute." *Eisenberg v. City of Miami Beach*, 54 F. Supp. 3d 1312, 1319 (S.D. Fla. 2014) (citing *Day v. Taylor*, 400 F.3d 1272, 1275-76 (11th Cir. 2005)). "In particular, the Court may 'take judicial notice of and consider documents which are public records.'" *Id.* (citing *Day*, 400 F.3d at 1275-76). Moreover, where a movant relies on or sets forth allegations [that] "were not presented or contained in the pleadings, including new exhibits, the Court cannot consider them without converting the motion into a motion for summary judgment." *Bernath v. Seavey*, No. 2:15-cv-358-FtM-99CM, 2015 WL 13805064, at *1 (M.D. Fla. Sept. 29, 2015).

"A motion for judgment on the pleadings is governed by the same standard as a Rule 12(b)(6) motion to dismiss." *Guarino v. Wyeth LLC*, 823 F. Supp. 2d 1289, 1291 (M.D. Fla. 2011). "In determining whether a party is entitled to judgment on the pleadings, [courts] accept as true all material facts alleged in the non-moving party's pleading, and [ ] view

those facts in the light most favorable to the non-moving party." *Perez*, 774 F.3d at 1335 (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). A complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

*ConSeal Int'l Inc. v. Neogen Corp.,* No. 19-CV-61242, 2020 WL 4736203, at *2–3 (S.D. Fla. Aug. 14, 2020) (brackets in original).

When a document appended to a pleading conflicts with the allegations in the Complaint, the document controls. *Int'l Star Registry of Illinois v. Omnipoint Mktg., LLC*, 510 F. Supp. 2d 1015, 1022 (S.D. Fla. 2007) (citing *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).[2]

### FACTS[3]

Dr. Morrison applied for, and received, clinical privileges at the Hospital in 2019. Over the next year, he asked repeatedly to be included in the trauma call. The

---

[2] At oral argument, the parties agreed that the Court could consider any documents appended to the pleadings or the motion papers. Despite this agreement, and to avoid converting the pending Motion into a Motion for Summary Judgment, I have only considered the Amended Complaint, the Hospital's Answer and Affirmative Defenses, and the documents attached to them.

[3] Unless otherwise noted, these facts are taken from the Amended Complaint and are viewed in the light most favorable to Dr. Morrison. Citations to paragraphs ("¶") refer to the Amended Complaint, ECF No. 52.

Hospital and others gave multiple, conflicting, and false reasons to keep him off the trauma call.

Meanwhile, Dr. Morrison "observed that [other neurosurgeons] engaged in a practice of diverting patients covered by Medicaid" because those patients were less lucrative. ¶50. "Dr. Morrison reported these concerns to several [Hospital] representatives, including but not limited to," the Chief Medical Officer and the Chief of the Medical Staff. *Id*. He also "made reports regarding an inappropriate relationship between [the Hospital's] preferred neurosurgery medical device distributor and the Zucker Defendants." ¶59. Specifically, he "reported his concerns that [the Hospital] was submitting false claims for payment to the federal government to several of his supervisors at [the Hospital], including, but not limited to the DMC Operating Room Director," the Chief Medical Officer, the Chief of the Medical Staff, and the Chief Operating Officer. ¶76.

On June 2, 2022, the Chief of the Medical Staff sent Dr. Morrison an email declining to meet about Dr. Morrison's being excluded from trauma call. ¶78. That same day, Dr. Morrison responded by lodging a report to the Chief of the Medical Staff and the Chief Medical Officer that he was being unfairly targeted and to report "Dr. Zucker's illegal and unethical practices." ¶81. At that time, Dr. Zucker was the Hospital's Chief of Neurosurgery. ¶79.

On or about June 24, 2022, the Hospital sent Dr. Morrison a letter notifying him that the previous day the Medical Executive Committee (MEC) had imposed a summary suspension of his Hospital privileges under Section 10.9.1 of the Medical

6

Staff Bylaws, based in part on patient care issues. ¶¶83, 85, 86; ECF No. 69-6 at 2-3.
The letter said:

> This summary suspension of your clinical privileges is temporary and
> effective until the MEC takes action to either terminate, modify, or
> continue the suspension, which it will do within 29 days (on or before
> Saturday July 23, 2022), pursuant to Sections 10.9.2 and 10.9.4 of the
> Bylaws. Consistent with Section 10.9.3 of the Bylaws, you are entitled
> to an informal interview with the MEC during and related to your
> suspension, where you can provide your position with regard to the
> conduct and circumstances at issue.

ECF No. 69-6 at 3. Bylaws Sections 10.9.2 and 10.9.4 had to do with deadlines and
notice. ECF No. 52-1 at 42-43. Section 10.9.3 is captioned "Investigation." It says:

> The MEC, before taking further action, shall conduct the investigation
> it deems necessary, which shall include offering the Practitioner an
> opportunity to meet with the MEC to respond to the suspension or
> restriction and explain his or her position with regard to the conduct or
> circumstances at issue. Neither the investigation nor any other
> activities of the MEC in determining whether to terminate, modify or
> continue the summary suspension or restriction shall constitute a
> hearing; they shall be informal, and none of the fair hearing rights under
> the Bylaws shall apply. In the event the affected Practitioner resigns his
> or her Medical Staff membership or privileges during the course of an
> investigation, such resignation shall be reported to the required
> regulatory authorities in accordance with state and federal law.

*Id*. at 42. The letter also said that one basis for the suspension was that the Hospital
had learned material information that Dr. Morrison had not previously disclosed.
¶86, ECF No. 69-6 at 2-3.

On July 7, 2022, DMC's lawyer "engaged in discussions with" Dr. Morrison's
lawyer. She said Dr. Morrison was under investigation, and "suggested that the
outcome of the investigation was predetermined against Dr. Morrison, and as a
result, Dr. Morrison should accept a settlement." ¶89. DMC's lawyers also sent an e-

7

mail to Dr. Morrison's lawyer, which said "the Medical Executive Committee began an investigation for issues related to professional competence." ¶89.

On July 8, 2022, the Chief of Staff invited Dr. Morrison to an informal meeting with the MEC "to respond to the suspension of your medical staff privileges and to explain your position with regard to the conduct and circumstances at issue." ¶91, ECF No. 69-9 at 2. The letter also said, "Additionally, as part of the MEC's investigation pursuant to Section 10.9.3 of the Medical Staff Bylaws, the MEC is reviewing [an additional patient care issue]." *Id.*

After the July 8, 2022, invitation to informally respond to the summary suspension, the Hospital "never corrected the false statements made by [its lawyers]." ¶92. Rather, on July 14, DMC's lawyer "engaged in another discussion with Mr. Monaghan in which she continued to press the false premise that Dr. Morrison was under Investigation." ¶¶92, 244.

On July 15, 2022, the parties signed a Settlement Agreement. ¶93. The terms of the agreement included:

- Dr. Morrison waived any rights to hearings or other relief under the Hospital Bylaws.

- Dr. Morrison agreed to resign from the Hospital Staff by July 20, and the Hospital agreed to promptly accept the resignation.

- The parties agreed to keep the terms of the settlement and all related documents confidential from third parties.

- Neither party admitted fault or liability.

8

- Dr. Morrison was given an advance copy of a letter that the Hospital was required to send to government authorities.

- The parties mutually released all claims "known or unknown, in law or in equity, which [they] ever had, now has, or hereafter can, shall or may have against [each other], directly or indirectly, from the beginning of time to the present, solely regarding" Dr. Morrison being given and potentially losing Hospital privileges and any reporting to governmental authorities.

- "[N]o promises, representations or warranties of any nature or kind whatsoever, other than those that maybe specifically set forth herein, have been made by any Party to any other Party in connection with the negotiation and execution of this Settlement Agreement."

ECF No. 69-11 at 3-4. That same day, Dr. Morrison resigned his Hospital privileges. ¶93. On July 21, 2022, the Hospital notified the NPDB that Dr. Morrison had voluntarily surrendered his privileges. ECF No. 69-2.

## DISCUSSION

A. *Fraudulent Inducement*

Under Florida law, fraudulent inducement occurs when a party: (1) makes a false statement of material fact; (2) that it knew or should have known was false, (3) intending that another person rely on the false statement, and (4) the other party justifiably relied on the false statement to its detriment. *E.g., Prieto v. Smook, Inc.,* 97 So. 3d 916, 917 (Fla. Dist. Ct. App. 2012). Fraudulent inducement excuses a party

from its obligations under a contract. *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.,* 761 So. 2d 306, 313 (Fla. 2000) ("It is axiomatic that fraudulent inducement renders a contract voidable, not void.").

Dr. Morrison alleges he justifiably and detrimentally relied on three Hospital misrepresentations:

- DMC stated that Dr. Morrison was under an Investigation pursuant to the Bylaws when he was not (FAC ¶¶89-93, 242, 244; Morrison Answer ¶42, Exhs. C, F);

- DMC falsely stated that the outcome of any proceeding would be predetermined against him, when in reality DMC possessed evidence exonerating Dr. Morrison (FAC ¶¶89-93, 242, 244; Morrison Answer ¶42, Exhs. C, D, F); and

- DMC was in possession of an independent peer review medical report clearing Dr. Morrison of any alleged wrongdoing, yet fraudulently omitted the report to induce Dr. Morrison to sign the Settlement Agreement (FAC ¶¶89-93, 242, 244; Morrison Answer ¶42, Exhs. C, D, F).

ECF No. 124 at 13-14. The Hospital denies making any false statement, but says in the alternative that Dr. Morrison could not have justifiably relied on these statements, as a matter of law.

Because any reliance on the other party's false statement must be justifiable, "[t]o be remediable, a representation must have been of such a nature and made under such circumstances that the injured party *had a right to rely upon it.*" *Columbus Hotel Corp. v. Hotel Management Co.,* 116 Fla. 464, 485-86 (1934) (emphasis in original).

> There can be no ground for complaint against representations where the hearer lacked the right to rely thereon, because he had reason to doubt the truth of the representation, as where the transaction was entered

10

into upon the express understanding of both parties that a material fact might exist of which one of them was ignorant, or where a party has expressly said that he would not be bound by his representations, or was obviously hostile to the hearer and interested in misleading him. 12 Ruling Case Law, 352; 26 Corpus Juris, 1141, 1142; *Smith v. Hollingsworth,* 85 Fla. 431, 96 So. 394. Even where a representation is made, if at the time thereof it is accompanied by a qualified statement which shows that the person making it does not intend that it shall be relied on, and which is reasonably calculated to suggest independent inquiry on the part of the person to whom it is made, the latter has no right to rely on it, and, on being deceived, claim that it was fraud. Am. & Eng. Ency. of Law, vol. 14, p. 117.

Misrepresentation amounting to fraud that will invalidate a contract must be made by one contracting party to another in reference to a matter affecting the contract. The person to whom it is made must not only believe the false representation to be true, but must be so situated with respect to what is represented that he, at the time, has the right to rely upon the truth of the representation as made. This is so, because the false representation must be material to the contract and must have induced the contract to be made. When dehors the contract, a false representation cannot be said to have induced its making, when it was so made as to carry on its face no right on the part of any one to rely on its credence. *Zavala Land & Water Company v. Tolbert (Tex. Civ. App.)* 165 S. W. 28.

*Id*. at 486–87.[4]

The Hospital says the *Columbus Hotel* principle applies to a settlement of any dispute or controversy. ECF No. 132 at 7. Dr. Morrison says it applies only where there was actual or threatened litigation. And, Dr. Morrison says there is no evidence that he threatened the Hospital with litigation involving fraudulent or dishonest conduct:

---

[4] "Dehors" means "outside the scope of." DEHORS, Black's Law Dictionary (11th ed. 2019).

> There is not a single allegation in the FAC (or any of Dr. Morrison's pleadings) of any pending or threatened litigation that was settled as part of the Settlement Agreement, let alone litigation that specifically involved fraud or dishonesty. The FAC clearly alleges that the Settlement Agreement arose out of DMC's purported investigation of Dr. Morrison's performance as a doctor—and not anything to do with fraud, dishonesty, or threatened litigation. (FAC ¶¶ 83- 86, 93).

ECF No. 124 at 20.

The Hospital replies that Dr. Morrison reads the prior precedent too literally and that the pre-settlement negotiations here included Dr. Morrison's claims that the Hospital was acting dishonestly toward him by denying him trauma privileges and the Hospital was violating the False Claims Act through its billing practices. ECF No. 132 at 7-8.

*Columbus Hotel* announced the legal principle that, in some situations, an alleged fraud victim cannot, as a matter of law, justifiably rely on the alleged fraudster. Like any other claim or defense, the lack of justifiable reliance can be proven by circumstantial evidence. *Columbus Hotel* said circumstantial evidence of an alleged victim's lack of justifiable reliance can include (1) the alleged victim knowing that material facts have not been disclosed, (2) the adverse party saying not to rely on any representations, (3) the adverse party having a motive to mislead, (4) the adverse party saying to conduct an independent investigation. *Id.*, 116 Fla. at 486-87.

Applying the *Columbus Hotel* rule to settlement agreements, a line of binding Eleventh Circuit cases holds that, as a matter of law, a person represented by counsel cannot justifiably rely on a statement made by an adverse party who that person has

accused of fraud or dishonesty. *See, e.g., Pettinelli v. Danzig,* 722 F.2d 706, 710 (11th Cir. 1984) ("When negotiating or attempting to compromise an existing controversy over fraud and dishonesty it is unreasonable to rely on representations made by the allegedly dishonest parties."); *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.,* 341 F.3d 1292, 1305 (11th Cir. 2003) ("Because Plaintiffs were represented by counsel, were in an antagonistic and distrusting relationship with DuPont, and settled litigation that included accusations of fraud and other dishonest conduct by DuPont, Plaintiffs could not reasonably or justifiably rely on any of DuPont's misrepresentations."); *Mergens v. Dreyfoos*, 166 F.3d 1114, 1118 (11th Cir. 1999) (no justifiable reliance where plaintiff was sophisticated litigant represented by counsel, parties had an adversarial relationship, and parties were settling a potential lawsuit that would have included allegations of fraud); *Affliati Network, Inc. v. Wanamaker,* 847 F. App'x 583, 586-87 (11th Cir. 2021) ("[W]hat was central to our analysis in [*Mergens* and *Green Leaf]* was that the plaintiffs were represented by counsel, 'in an antagonistic and distrusting relationship' with the defendants, and had settled litigation, or threatened litigation, 'that included accusations of fraud and other dishonest conduct.'"). These cases looked to circumstantial evidence such as whether the parties were represented by counsel, the plaintiff was told not to rely on any representations, the parties had an adversarial relationship, and whether the settlement agreement included a merger clause. Although they involve litigation, several cases talk about the parties resolving a "controversy," *Mergens,* 166 F.3d at 1118, or a "dispute." *Affliati*, 847 Fed. Appx at 586 (quoting *Green Leaf*).

13

Taken together, these cases stand for an unsurprising proposition — whether a party justifiably relied on a false representation is evaluated under the totality of the circumstances and can be established through circumstantial evidence. *Accord M/I Schottenstein Homes, Inc. v. Azam,* 813 So. 2d 91, 95 (Fla. 2002) (In deciding whether justifiable reliance exists, courts should consider "the totality of the circumstances surrounding the type of information, the nature of the communication between the parties, and the relative positions of the parties."). Although pending or threatened litigation is one piece of circumstantial evidence, it is not required in every case.

The Eleventh Circuit's most recent decision, *Affliati,* provides additional support for the conclusion that Dr. Morrison reads *Columbus Hotel* too narrowly. In *Affliati,* the parties settled a filed lawsuit in which there had been counterclaims based on alleged fraudulent advertising practices and misappropriation of intellectual property.  The plaintiff later sued for breach of the confidentiality and non-disparagement provisions of the settlement agreement. The defendant filed a counterclaim to void the settlement agreement based on fraudulent inducement, in particular, allegedly false statements by plaintiff's counsel during discovery. The trial court dismissed the counterclaims based on *Columbus Hotel.*

The Eleventh Circuit affirmed. It reaffirmed "the well-established and common sense principle of law espoused in *Columbus Hotel* and its progeny: generally, adverse parties negotiating a settlement agreement in an attempt to avoid litigation cannot rely upon the representations of one another." *Affliati*, 847 Fed. Appx. at 588 (quoting

14

*Moriber v. Dreiling,* 194 So. 3d. 369, 374 (Fla. Dist. Ct. App. 2016). *Affliati* also said it was not necessary to have "an exact parallel between the fraud claims resolved by a settlement agreement and those alleged to have induced the settlement." *Id.*, at 587. It noted, "What was central to our analysis in [*Mergens* and *Green Leaf]* was that the plaintiffs were represented by counsel, 'in an antagonistic and distrusting relationship' with the defendants, and had settled litigation, or threatened litigation, 'that included accusations of fraud and other dishonest conduct.'" *Id.* Notably, the Eleventh Circuit never said that these factors were *necessary* in all cases; it merely said they were sufficient in *Mergens* and *Green Leaf.*

So, the question before this Court is whether, viewing the pleadings in the light most favorable to Dr. Morrison, he could have justifiably relied on the Hospital's alleged misrepresentations. As a matter of law, he could not.

This case fits squarely within the *Mergens/Green Leaf* framework. First, Dr. Morrison was represented by counsel. Second, he was in an antagonistic posture to the Hospital. Third, a sufficient "dispute" or "controversy" existed. When the Settlement Agreement was negotiated, Dr. Morrison was clearly in an antagonistic and distrusting relationship with the Hospital. He had accused the Hospital of violating the False Claims Act, ¶76, and had told the Hospital that Dr. Zucker was engaging in illegal and unethical practices, ¶81. Although he had not overtly threatened to file a *qui tam* action, the Hospital reasonably could have inferred that threat.

15

Additionally, the Hospital had initiated a peer review process under its Bylaws that was analogous to litigation in a court. Dr. Morrison had been formally notified that his Hospital privileges were at risk. He had been invited to provide evidence at an informal meeting. Had that process proceeded, it potentially included a hearing with sworn testimony, a right to be represented by counsel, appeal procedures within the Hospital, and judicial review. *See* ECF No. 52-1, Articles 10 and 11; *see also, e.g., Genchi v. Lower Fla. Keys Hosp. Dist.*, 45 So. 3d 915, 917 (Fla. Dist. Ct. App. 2010) (doctor sued hospital for wrongfully terminating staff privileges). This situation independently was a sufficient "dispute" or "controversy."

Additional circumstantial evidence also weighs against a finding of justifiable reliance. The Settlement Agreement contained a non-reliance clause and a merger clause. Dr. Morrison believed that the Hospital was conspiring to keep him off of trauma call and was giving him false reasons why he could not have that call. The Amended Complaint clearly pleads that Dr. Morrison believed the Hospital was dishonest and was making untruthful statements.

Even when viewed in the light most favorable to Dr. Morrison, the totality of the circumstantial evidence compels a finding that he had no right to rely on the Hospital's alleged false representations. Dr. Morrison cannot rescind the Settlement Agreement based on fraudulent inducement.

B. *Consideration*

Dr. Morrison argues that even if the Settlement Agreement cannot be rescinded, it is unenforceable because it lacked consideration. He says he has

plausibly alleged a lack of consideration. ECF No. 121 at 25-26. In the alternative, he says the existence (or not) of consideration is a disputed issue of fact that precludes judgment on the pleadings.

"For there to be an enforceable contract, 'there must be an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained." *W. Const., Inc. v. Fla. Blacktop, Inc.*, 88 So. 3d 301, 304 (Fla. Dist. Ct. App. 2012) (citation omitted). "A promise, no matter how slight, qualifies as consideration if the promisor agrees to do something that he or she is not already obligated to do." *Cintas Corp. No. 2 v. Schwalier,* 901 So. 2d 307, 309 (Fla. Dist. Ct. App. 2005) (further citation omitted). Consideration also exists if a person agrees not to do something they otherwise would have the right to do, or agrees to modify the existing legal relationship between the parties. *See, e.g.,* Consideration, Black's Law Dictionary (11th ed. 2019) ("Something (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promisee; that which motivates a person to do something, esp. to engage in a legal act."); Restatement (Second) of Contracts § 71 (1981) ("The performance may consist of (a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification, or destruction of a legal relation.").

In the Settlement Agreement, Dr. Morrison released

[any claims] which Morrison ever had, now has, or hereafter can, shall or may have against DMC, directly or indirectly, from the beginning of time to the present, solely regarding the Credentialing and Peer Review Activities and the Summary Suspension, and including the expiration of

> Dr. Morrison's Medical Staff membership and the Hospital's resulting
> report(s) to the National Practitioner Data Bank.

ECF No. 69-11 ¶7. The Hospital's Motion says Dr. Morrison received the following consideration: (1) the Hospital released any present or future claims against him, including the claims now asserted as Counterclaims in this litigation,[5] (2) he received an advance copy of the NPDB report, and (3) the Hospital promptly accepted his resignation. ECF No. 119-1 at 32-38.[6]

The Amended Complaint makes three arguments why there was no consideration for this release. It alleges "DMC had no actual or potential claims against Dr. Morrison that were released or could have been released by virtue of the Settlement Agreement. In addition, Dr. Morrison received no benefit through the NPDB reporting process . . . [because] Dr. Morrison had no influence whatsoever over

---

[5] As part of the Settlement Agreement, the Hospital released any past, present, or future claims it might have against Dr. Morrison:

> [DMC releases claims it] ever had, now has, or hereafter can, shall or may have against Morrison, directly or indirectly, from the beginning of time to the present, solely regarding the Credentialing and Peer Review Activities and the Summary Suspension, and including the expiration of Dr. Morrison's Medical Staff membership and the Hospital's resulting report(s) to the National Practitioner Data Bank.

ECF No. 69-11 ¶8.

[6] At oral argument, the Hospital said other consideration existed beyond what was listed in the Motion. The Court will not consider these additional alleged considerations because they were not raised in the Hospital's briefing. *See Lanier v. City of Miami*, No. 23-CV-22510, 2023 WL 8527177, at *9, n.4 (S.D. Fla. Dec. 8, 2023) (declining to consider arguments raised for the first time in post-briefing hearing).

the content of any report to the NPDB." ¶94. It further pleads, "Dr. Morrison also did not gain the benefit of avoiding Investigation by the Settlement Agreement. Had Dr. Morrison simply resigned on July 15 without an accompanying Settlement Agreement, further administrative action under the Bylaws would have stopped and the same NPDB reporting requirements would have applied." ¶95.

Dr. Morrison also points to the following statements in Paragraph 94 of the Amended Complaint:

- "the Settlement Agreement does not provide Dr. Morrison with any consideration and is thus unenforceable for lack of consideration."

- "DMC had no actual or potential claims against Dr. Morrison that were released or could have been released by virtue of the Settlement Agreement."

ECF No. 121 at 25 (quoting FAC ¶94). He says the latter statement creates a disputed issue of fact that precludes judgment on the pleadings. He also notes the Hospital did not allege its current Counterclaims during the settlement negotiations. *Id.* at 26. He further argues that the Hospital's counterclaims lack merit. ECF No. 121 at 26-27.

Finally, Dr. Morrison says that seeing the NPDB report beforehand is not consideration because that action predated the Settlement Agreement. As such, "Dr. Morrison already had the alleged 'benefit' before even signing the Settlement Agreement and such benefit could not, therefore, constitute consideration for entering into the Settlement Agreement." ECF No. 124 at 28.

In its Reply, the Hospital says (1) the allegations in paragraph 94 of the Amended Complaint are legal conclusions not entitled to the assumption of truth, (2) its potential claims against Dr. Morrison were objectively colorable, so agreeing to forego them was sufficient consideration, (3) "purchasing peace" by extinguishing any past and future claims is sufficient consideration, and (4) the timing of the benefit is irrelevant if it is understood by the parties to be part of the negotiated bargain. ECF No. 132 at 12-17.

The allegation in Paragraph 94 of the Amended Complaint that "the Settlement Agreement does not provide Dr. Morrison with any consideration and is thus unenforceable for lack of consideration" is a legal conclusion not entitled to the assumption of truth. I need not resolve whether the other allegation in Paragraph 94 creates a disputed issue of fact because there is consideration even if the Hospital has no current claims against Dr. Morrison.

It is irrelevant to the consideration question whether the Hospital has current actual or potential claims against Dr. Morrison. The parties negotiated a broader release. The Hospital gave up its right to sue Dr. Morrison for any claim it "ever had, now has, or hereafter can, shall or may have . . . solely regarding the Credentialing and Peer Review Activities and the Summary Suspension, and including the expiration of Dr. Morrison's Medical Staff membership and the Hospital's resulting report(s) to the National Practitioner Data Bank." This release "purchased peace" for Dr. Morrison because he got the bargained-for right not to have to incur the cost and time of litigating against the Hospital in the future. For the same reason, I reject Dr.

20

Morrison's argument that there is no consideration because the Hospital's counterclaims are meritless. Whether or not they are meritless, Dr. Morrison bargained for the right not to have to litigate them, which was a benefit to him and was valid consideration for his release.

The Hospital allowing Dr. Morrison to see the NPDB report before it was filed was also valid consideration for his release. The Hospital was not required to show the report to Dr. Morrison in advance.

The fact that Dr. Morrison saw the report before the Settlement Agreement was finalized does not affect whether seeing it was valid consideration. Dr. Morrison was notified of his suspension on June 24, 2022. ECF No. 69-6. By July 7, the parties were negotiating a settlement. ECF No. 69-12 at 5. That day, the Hospital's counsel sent Dr. Morrison's counsel proposed NPDB reporting language. *Id*. Thereafter, as part of a thread of settlement negotiation emails, on July 13, the lawyers exchanged proposed NPDB language. *Id*. at 4. On July 14, in an email marked "For Settlement Purposes Only," the Hospital's counsel sent Dr. Morrison's counsel a draft of the NPDB Report that would be filed if Dr. Morrison resigned. *Id*. at 7. The Settlement Agreement was executed the next day, on July 15, and included a term relating to the NPDB Report:

> The Parties agree and understand that the Resignation constitutes a reportable event to federal and state authorities. The Parties further understand that the Hospital has solely determined the form and content of the report and has communicated the language of the report to Dr. Morrison's legal counsel in a separate correspondence, which shall be considered a part of this Settlement Agreement.

ECF No. 69-11 ¶6. Clearly, the right to see the NPDB Report in advance was negotiated as part of the overall settlement discussions and was then memorialized by Settlement Agreement. *See Andrade v. Blueware, Inc.,* No. 6:13-CV-1507-ORL-41, 2015 WL 2415690, at *2 n.3 (M.D. Fla. May 20, 2015).

Valid consideration existed for Dr. Morrison's release, so that release is enforceable.

C. *Scope of Release*

Although the Release is enforceable, the Amended Complaint plausibly pleads some claims that fall outside the scope of the Release. To recap, the Release covered:

> Dr. Morrison, and his heirs, executors, personal representatives, agents, attorneys, accountants, successors, assigns, and other representatives (collectively "Morrison"), for and in consideration of the promises and mutual agreements contained in this Agreement, received from or on behalf of the Hospital, and its present and former officers, directors, employees, agents, attorneys, accountants, auditors, predecessors, and its Governing Board, Administration, Medical Executive Committee and Medical Staff (collectively "DMC"), the receipt whereof is hereby acknowledged, hereby remises, releases, covenants not to sue, acquits, satisfies, and forever discharges DMC, of and from all, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, known or unknown, in law or in equity, which Morrison ever had, now has, or hereafter can, shall or may have against DMC, directly or indirectly, from the beginning of time to the present, solely regarding the Credentialing and Peer Review Activities and the Summary Suspension, and including the expiration of Dr. Morrison's Medical Staff membership and the Hospital's resulting report(s) to the National Practitioner Data Bank. This Agreement is not intended to release and does not release any other claims, causes of action, obligations, rights, liabilities, statutory or contractual duties and/or obligations of any kind or nature whatsoever, including, but not limited to, any potential malpractice claims, liabilities, causes of action, lawsuits, or any other

proceedings arising from the care and treatment of patients at the Hospital, including, without limitation, Dr. Morrison's care and treatment with respect to Medical Record numbers 671496, 713109, 668176, 687919, and 717126.

ECF No. 69-11 at 3-4. As relevant here, it is limited to matters "regarding the Credentialing and Peer Review Activities and the Summary Suspension, and including the expiration of Dr. Morrison's Medical Staff membership and the Hospital's resulting report(s) to the National Practitioner Data Bank."

Count II alleges that the Hospital violated FDUTPA by excluding Dr. Morrison from trauma call, filing a false NPDB Report, retaliating against Dr. Morrison for filing complaints, fraudulently inducing Dr. Morrison to resign from the Hospital staff, and not referring certain non-Medicaid patients to Dr. Morrison. ¶133. Any FDUTPA claim based on the NPDB Report and Dr. Morrison's resignation were released. I cannot say on the present record that the remaining FDUTPA claims fall within the scope of the release. At a minimum, there are disputed issues of fact on that question.

Counts IV and V allege tortious interference based on fraudulently inducing Dr. Morrison to resign and filing false reports with the NPDB. ¶¶ 154, 167. These claims were released.

Count VIII alleges the Hospital and others conspired "to abuse the peer review process . . . to initiate sham proceedings against Dr. Morrison based on a false premise and then use fraud to coerce Dr. Morrison to resign." ¶195. It further alleges that the Hospital and others falsely told patients that Dr. Morrison was intoxicated in the

23

operating room and was arrested for driving while intoxicated. *Id*. Any unfair competition claim based on the peer review process and Dr. Morrison's resignation were released. I cannot say on the present record that the remaining unfair competition claims fall within the scope of the release. At a minimum, there are disputed issues of fact on that question.

Count IX alleges that the Hospital defamed Dr. Morrison by submitting false reports to the NPDB. ¶201. It further alleges that the Hospital falsely told patients that Dr. Morrison was intoxicated in the operating room and was arrested for driving while intoxicated. ¶213. Count X alleges injurious falsehood based on the same facts alleged in Count IX. ¶¶220, 229. Any defamation or injurious falsehood claim based on the NPDB reporting was released. I cannot say on the present record that the remaining defamation and injurious falsehood claims fall within the scope of the release. At a minimum, there are disputed issues of fact on that question.

Count XIII alleges the Hospital was part of a civil conspiracy. One object of the alleged conspiracy was to file a false report with the NPDB. ¶258 (incorporating ¶¶ 96-104). The other object was to pretextually exclude him from trauma call. *Id*. (incorporating ¶¶ 39-66). Any civil conspiracy based on the NPBD reporting was released. I cannot say on the present record that Dr. Morrison released a civil conspiracy claim based on being pretextually excluded from trauma call. At a minimum, there are disputed issues of fact on that question.

Although not entirely clear, it also appears that Count XIII incorporates all other counts in the Amended Complaint as objects of the conspiracy. To the extent

Count XIII says that Counts II, IV, V, VIII, IX, and X are objects of the conspiracy, the rulings above for those Counts apply equally to Count XIII.

## CONCLUSION

Judgment on the Pleadings is GRANTED IN PART AND DENIED IN PART on the Hospital's 25th Affirmative Defense. Counts IV and V are dismissed with prejudice.

**DONE and ORDERED** in Chambers this 19th day of April, 2024, at West Palm Beach in the Southern District of Florida.

_____
    BRUCE E. REINHART
    UNITED STATES MAGISTRATE JUDGE